**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDITH GRIFFIN ELLISON,        :      CIVIL CASE
     Plaintiff,               :
                v.        :
                              :
BHBC NORTHWEST PSYCHIATRIC  :
HOSPITAL, et al.,             :
     Defendants.            :      NO. 11-5106

## MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Baylson, J.**                                                                              **April 9, 2013**

## I.    Introduction

Plaintiff Edith Griffin Ellison ("Plaintiff") filed a Complaint alleging race discrimination

and retaliation in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.;

42 U.S.C. § 1981; and the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa. C.S. § 955,

against her former employer, BHC Northwest Psychiatric Hospital LLC d/b/a Brooke Glen

Behavioral Hospital ("Brooke Glen"), as well certain of her managers and supervisors – Mark

Schor, former CEO; Dawn Kownacki, former Human Resources Director; Mary Ellen Greene, a

nurse manager; and Kim Hofmann, Director of Nursing – and Christine Kaun, an hourly

registered nurse and Plaintiff's former co-worker.

Plaintiff stipulated to dismissal of her PHRA claims (ECF 11).[1]  Accordingly, Plaintiff's

only remaining claims allege violations of Title VII and section 1981.  Currently before the

Court is Defendants' Motion for Summary Judgment (the "Motion") (ECF 48).

## II.    Procedural History

Defendants filed their Motion on October 1, 2012.  Plaintiff filed her Response (ECF 52)

on October 31, 2012, to which Defendants replied (ECF 53) on November 8, 2012.  The Court

---

[1] Plaintiff also stipulated to dismissal of Defendants Mark Schor and Dawn Kownacki
(ECF 29).

held oral argument on January 28, 2013. At the argument, the Court suggested that Plaintiff amend her statement of undisputed facts in order to comply with the requirements of Fed. R. Civ. P. 56(c), and also invited her to submit a supplemental letter brief citing cases regarding legal issues that were clarified during the argument, to which Defendants were given leave to respond.

Plaintiff filed her Amended Statement of Undisputed Facts (ECF 57) on February 12, 2013, but did not file, or otherwise submit to the Court, any additional legal briefing. Attached to Plaintiff's amended statement of undisputed facts were two additional affidavits. Defendants responded (ECF 58) to Plaintiff's amended statement of undisputed facts on February 22, 2013.

## III. Parties' Statements of Undisputed Facts

Pursuant to the Court's Pretrial and Trial Procedures – Civil Cases, Section C, Defendants filed a Statement of Undisputed Facts, "which set[] forth, in numbered paragraphs, all material facts that [Defendants] contend[] are undisputed, with record references." Plaintiff initially filed what she styled a "counterstatement of undisputed facts," which, while setting forth numbered paragraphs and referencing the record, did not "respond[] to the numbered paragraphs set forth in the [Defendants'] statement," as required by the Court's Pretrial and Trial Procedures and Rule 56(c).

Plaintiff's Amended Statement of Undisputed Facts, while responding to the numbered paragraphs in Defendants' statement, often did not support alleged factual disputes with citations to the record. Instead, Plaintiff relied on legal arguments and concluded that she was not required to respond to Defendants' facts. (E.g., Pl.'s Am. Statement of Undisputed Facts ("Pl.'s Am. SUF") ¶ 19.)

The Court finds it unnecessary to address every argument advanced by Plaintiff. However, the Court does address three of Plaintiff's often repeated arguments:

1. The Court must disregard even uncontradicted testimony from interested witnesses if that testimony supports Defendant.

    a. The Court rejects this argument as contrary to well-established Third Circuit precedent.  Plaintiff relied on <u>Hill v. City of Scranton</u>, 411 F.3d 118 (3d Cir. 2005) (citing <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133 (2000)).  However, the Third Circuit has subsequently explained that "in considering a motion for summary judgment <u>the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness.</u>"[2] <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 272 (3d Cir. 2007) (emphasis added); <u>accord</u> <u>Murphy v. Radnor Twp.</u>, — F. Supp. 2d —, Civil Action No. 11–4743, 2012 WL 5400084, at *6 (E.D. Pa. Nov. 6, 2012) (Tucker, J.);

2. The Court should disregard any testimony with which Plaintiff disagrees – particularly any testimony regarding a witness's belief or perception – because reliance on such testimony requires a credibility determination that is inappropriate at the summary judgment stage.

    a. The Court rejects this argument as well – it is entirely at odds with the law, as is clear from the preceding discussion.  <u>See</u> <u>DeFlaminis</u>, 480 F.3d at 272.

3. Plaintiff need only respond to facts that she considers material.

    a. Plaintiff's argument is rejected as unsupported by and inconsistent with the text of Rule 56.  Neither Rule 56(c) nor (e) suggests that a party need only respond to facts it

---

[2] By way of example, the Third Circuit stated that:

> [I]n a controlled intersection traffic accident case[,] if the moving party on a motion for summary judgment presents his deposition testimony that the light was green for him and red for the other party and there is no contrary evidence, and there is nothing implausible about the deposition, in considering the motion the court should accept the deposition testimony as true.  <u>If it does not do so then, contrary to all precedent, it would allow the non-moving party to defeat the motion with mere allegations</u>.

<u>DeFlaminis</u>, 480 F.3d at 272 n.13 (emphasis added).

considers material or that the Court may accept as true only
those facts the non-moving party deems material.

Where Plaintiff cited no contrary evidence and her legal challenges fail, the Court finds that she

has admitted the facts as stated by Defendant, <u>see</u> Fed. R. Civ. P. 56(c), (e), subject to the Court

verifying that Defendant accurately cited the record.

Plaintiff's amended statement of undisputed facts also cited affidavits that were not

submitted with her Response to Defendants' Motion.  These affidavits are undated and, while

including the statement "[i]f called to testify, I would competently testify to the statements

above," are unsworn and do not otherwise meet the requirements for consideration by the Court

on a motion for summary judgment.  <u>See</u> <u>Ray v. Pinnacle Health Hosps., Inc.</u>, 416 F. App'x 157,

164, (3d Cir. 2010) ("Unsworn declarations may substitute for sworn affidavits where they are

made under penalty of perjury and otherwise comply with the requirements of 28 U.S.C. §

1746.").  For example, the Affidavit of Monica Hailstalk contains a statement regarding racial

bias at Brooke Glen that directly conflicts with her earlier written statement in the record[3]; and

the Affidavit of Dawn Ali, whose deposition was never taken, makes bald assertions that are not

---

[3] In a written statement dated January 28, 2010, Hailstalk responded "No" to the question
"Have you ever observed any act of unfair racial treatment on your unit [at Brooke Glen]?"
(Kownacki Dep., May 8, 2012, Ex. 3 at BG00364).  However, in her affidavit, Hailstalk stated,
"I believe the mistreatment of [Plaintiff] was racial because I did not see the Caucasians treated
the same way."  (Hailstalk Aff. ¶ 6, Pl.'s Am. SUF, Ex. A.)

The Third Circuit's "'sham affidavit' cases – which permit courts to ignore affidavits that
contradict earlier deposition testimony without adequate explanation –" provide, by analogy, a
basis for this Court to ignore Hailstalk's affidavit.  <u>EBC, Inc. v. Clark Bldg. Sys, Inc.</u>, 618 F.3d
253, 268 (3d Cir. 2010) (noting that the Third Circuit has "affirmed a district court's refusal to
consider a 'squarely contradict[ory]' affidavit filed after a summary judgment motion had been
filed." (alteration in original) (citing <u>Martin v. Merrell Dow Pharm., Inc.</u>, 851 F.2d 703, 705-06
(3d Cir. 1988)).  Hailstalk's affidavit, though it does not contradict deposition testimony, fits the
general mold of a sham affidavit:  it was clearly "'offered solely for the purpose of defeating
summary judgment,'" and there is no "'independent evidence in the record to bolster [this]
otherwise questionable affidavit.'"  <u>Id.</u> (quoting <u>Jiminez v. All Am. Rathskeller, Inc.</u>, 503 F.3d
247, 253 (3d Cir. 2007)).

corroborated by other evidence in the record.[4]  Byrne v. Monmouth Cnty. Dep't of Health Care Facilities, 372 F. App'x 232, 233-34 (3d Cir. 2010) (requirements of Rule 56(e) were not met by a certification that "was unsworn and was not supported by any of the documentation or factual testimony gathered during the discovery process").

## III.  Facts Undisputed by the Parties[5]

Plaintiff was hired by Brooke Glen as a registered nurse in May 2008.  (Defs.' Statement of Undisputed Facts ("Defs.' SUF") ¶ 16.)  Plaintiff began her employment on probationary status, which she completed in July 2008, at which time she was assigned to work the evening shift on the adolescent unit.  (Id. ¶ 20.)  The evening shift on the adolescent unit was staffed by two nurses, one nurse performed duties related to medication (the "medication nurse"), the other performed charge nurse duties (the "charge nurse").  (Id.)  The charge nurse receives an hourly wage increase referred to as "charge pay."  (Kownacki Dep. 56:19-24.)  One of the other nurses who worked the adolescent unit evening shift was Defendant Kaun.  (Defs.' SUF ¶¶ 49, 51-53.)

Sometime after Plaintiff was assigned to the adolescent unit, she spoke with Kaun about assuming charge nurse duty.  (Id. ¶ 51.)  Kaun told Plaintiff that Plaintiff should speak to their immediate supervisor, Defendant Greene.  (Id. ¶¶ 21, 52.)  Greene was responsible for management of the staff on adolescent unit, including Plaintiff and Kaun.  (Id. ¶ 21.)  Several

---

[4] Ali's affidavit makes statements regarding her perceptions of how nurses other than Plaintiff were treated, and accuses Hofmann and Kownacki of refusing to address Plaintiff's complaints of racial discrimination.  (Ali Aff. ¶¶ 4-7, Pl.'s Am. SUF, Ex. B.)  However, Ali points to no specific facts that support her allegations.

[5] In the following account of the facts in this case, Plaintiff did not dispute the facts as cited by the Court in the following paragraphs of the Defendants' Statement of Undisputed Facts: 16, 20-21, 35, 49, 51-53, 80-81, 90, 93-95, 97, 99, 105-07, 113, 115, 117, 122-23, 128-29, 131, 134, 140-46, and 163.  Plaintiff did dispute the facts as cited by the Court in the following paragraphs of the Defendants' statement, but her disputes were based on the legal arguments that the Court rejected in Section III:  92, 96, 100, 126, 130, and 159-61.  The Court verified that Defendants' account is consistent with their record citations.

months after speaking to Kaun, Plaintiff spoke to Greene about being the charge nurse, and Greene responded that Plaintiff needed to speak with Kaun. (Id. ¶ 53.) Plaintiff was never able to work as charge nurse when working with Kaun. (Id. ¶¶ 51-53.) Plaintiff was, however, allowed to assume charge nurse duties at other times, including when Kaun was on vacation. (Id. ¶¶ 80-81.)

Plaintiff and Kaun had an acrimonious relationship. Plaintiff's co-workers believed that Kaun treated her poorly, including the use of unnecessarily harsh language. (E.g., Hofmann Dep., May 9, 2012, Ex. 10 at BGBH00267; Kownacki Dep., Ex. 3 at BG00363 (Plaintiff "takes a lot" from Kaun).) Kaun also sent a series of emails to her supervisors over the course of 2009 complaining, sometimes at length, about what she perceived to be Plaintiff's poor job performance. (Kaun Dep., May 9, 2012, Exs. 1-3, 5, 7-10, 12-13, 15-19, 21-22, 25.)

Ultimately, Plaintiff decided to make a formal complaint to Brooke Glen about Kaun's behavior. In January 2010, Plaintiff and her union representative met with management – Defendant Hofmann, Director of Nursing, and Defendant Kownacki, Director of Human Resources – to address her concerns. (Defs.' SUF ¶ 90.) At the meeting, Plaintiff presented a written complaint about a work environment described as "hostile" and "promot[ing] personal bias." (Id. ¶¶ 92-93.) Plaintiff's written complaint also described a personality conflict with Kaun, classifying her behavior as bullying, but contains no mention of race. (Id. ¶¶ 93-96.) Plaintiff did verbally raise concerns about Kaun's behavior being the result of racial animus. (Id. ¶ 90.)

Plaintiff also verbally raised concerns regarding charge pay in a short discussion at the end of the meeting. (Id. ¶ 96.) Although Plaintiff believes that she communicated that she had been improperly denied work as charge nurse, Brooke Glen management did not understand her

complaint – they believed Plaintiff was complaining that she had not received charge pay for hours she had already worked as charge nurse.  (Id. ¶ 96.)

Plaintiff's January 2010 complaint resulted in an investigation into Kaun's behavior, including interviewing the employees on the adolescent unit and taking written statements.  (Id. ¶¶ 99, 100-01.)  None of the employees corroborated Plaintiff's allegations that Kaun bullied her, or that Kaun's conduct was racially motivated.  (Id. ¶¶ 105-07.)  Nevertheless, Kaun voluntarily transferred off of the adolescent unit.  (Id. ¶¶ 113, 115.)  Plaintiff and Kaun never worked together again.  (Id. ¶117.)

Kownacki also looked into Plaintiff's charge pay complaint, but had difficulty resolving the issue.  Brooke Glen's records showed that Plaintiff had been paid for 898 hours of charge nurse work out of her 2080 total hours of work during 2009.  (Id. ¶ 81; Kownacki Dep. 56:2-59:8, 73:10-18, 75:13-76:2.)

On February 16, 2010, Plaintiff filed an Equal Employment Opportunity Commission (EEOC) complaint stating that she had been denied the opportunity to rotate as charge nurse because of her race and repeating her bullying allegation against Kaun.  (Defs.' SUF ¶¶ 122-23, 126.)  The EEOC complaint was served on Brooke Glen sometime in March 2010.  (Kownacki Dep. 24:13-25:13.)  Brooke Glen did not take action on the EEOC complaint until sometime in April 2010, because Kownacki, the person responsible for investigating the complaint, was on leave from March 2010 until April 2010.  (Id. at 24:9-25:19; Defs.' SUF ¶¶ 126, 128.)  Plaintiff was also on leave she requested from April 11, 2010 until May 26, 2010.  (Defs.' SUF ¶ 128.)

In May 2010, Brooke Glen requested that Plaintiff attend a meeting to address her EEOC complaint.  (Defs.' SUF ¶ 129.)  The meeting occurred on the first day that Plaintiff returned from her leave, which was also the first day that both Kownacki and Plaintiff were at work on

the same day after Brooke Glen received Plaintiff's EEOC complaint.  (Id. ¶ 131.)  The meeting was the first time that Kownacki understood that Plaintiff was complaining that Kaun had refused to rotate with her as charge nurse.  (Id. ¶ 130.)

The meeting – attended by Plaintiff, Plaintiff's union president, Kownacki, Schor, Hofmann, and Greene – did not go well.  Plaintiff had a bag containing a number of papers, which she began presenting in order to establish that she has been denied charge nurse work. (Id. ¶ 133; Pl.'s Am. SUF ¶ 133.)  Plaintiff produced two papers, assignment sheets from the adolescent unit, which Brooke Glen management understood to contain confidential patient information.  (Pl.'s Am. SUF ¶ 133.)[6]  Plaintiff's possession of these papers appeared to be a violation of medical record confidentiality law and the Brooke Glen Employee Handbook and Employee Code of Ethics, which Plaintiff had signed.  (Defs.' SUF ¶¶ 140-46, 149.)

An apparently heated exchange followed, during which Brooke Glen management demanded that Plaintiff turn over the assignment sheets and any other hospital records she had in her bag, though the content of Plaintiff's additional documents had not been revealed.  (Id. ¶ 134; Pl.'s Am. SUF ¶ 134.)  During the exchange, the word "termination" may have been used, and Brooke Glen management threatened to call the police if Plaintiff did not return the hospital's documents.  (Pl.'s Am. SUF ¶ 136.)[7]  At the end of the meeting, Plaintiff was placed on administrative leave with pay.  (Kownacki Dep. 81:23-82:3, 82:19-83:8.)  The length of Plaintiff's administrative leave is unclear.  Although she was out of work for approximately a week after the meeting, the record establishes that Brooke Glen would have let her return to work sooner, but Plaintiff requested time off.  (Id. at 83:3-14.)  Plaintiff's submissions did not

---

[6] The Court adopts Plaintiff's account that she produced only two papers, because Defendants have pointed to no evidence that she produced more than two papers, and the number of papers produced is ultimately immaterial to the disposition of Defendants' Motion.

[7] Defendants did not dispute these factual allegations.

specifically address how long she was on administrative leave. When Plaintiff returned to work, no further disciplinary action was taken against her. (Defs.' SUF ¶ 139.)

A little less than a month after Plaintiff returned to work, she was charged with mishandling patient information, which resulted in a disciplinary warning. (Id. ¶¶ 159-60.) Brooke Glen management contacted Plaintiff by phone to let her know that she needed to discuss the incident and possible disciplinary action. (Id. ¶ 161.) Plaintiff subsequently requested additional leave and then never returned to work. (Id. ¶ 163.) Plaintiff later settled her charge pay dispute for $2,000. (Id. ¶ 35.)

## IV.    Legal Standard for Summary Judgment

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative." Anderson, 477 U.S. at 249 (citations omitted). Under Rule 56, the Court must view the evidence

in the light most favorable to the non-moving party and draw all justifiable inferences in favor of

the non-movant.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

## V.    Discussion[8]

Plaintiff's claims consist of three separate categories:

1.  Discrimination in work assignment, because she was allegedly
    denied rotation as charge nurse when working with Kaun;

2.  Discrimination resulting from a hostile work environment
    allegedly created by Kaun's conduct toward Plaintiff; and

3.  Retaliation for filing complaints about this alleged
    discrimination.

The Court will analyze each category in turn.

### A.    Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Find Discrimination in Her Work Assignments.

It is unlawful employment practice for an employer "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prevail on a claim of

disparate treatment, the plaintiff must demonstrate purposeful discrimination.  Patterson v.

McLean Credit Union, 491 U.S. 164 (1989); Weldon v. Kraft, Inc., 896 F.2d 793, 796 (3d Cir.

1990).

---

[8] Because Plaintiff's claims under Title VII and section 1981 are analyzed under the same standards, the Court performs a single analysis under Title VII.  Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010) (citing Humphries v. CBOCS West, Inc., 474 F.3d 387, 403-04 (7th Cir.2007), aff'd, 553 U.S. 442 (2008)); Ocasio v. Lehigh Valley Family Health Center, 92 F. App'x 876, 879 (3d Cir. 2004) (citing Manatt v. Bank of Am., 339 F.3d 792, 797 (9th Cir.2003); Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir.2002); and Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir.2001)); Williams v. Mercy Health System, 866 F.Supp.2d 490, 496 (E.D. Pa. 2012) (Robreno, J.) (citing Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009)).

Plaintiff has pointed to no direct evidence of discrimination and, therefore, must prove intent through the familiar framework established in the McDonnell Douglas-Burdine-Hicks line of cases. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). The threshold issue is whether Plaintiff has established by a preponderance of the evidence that a prima facie case of unlawful discrimination exists. Hicks, 509 U.S. at 506; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). To establish a prima facie case, Plaintiff must initially introduce evidence showing that:

1. She is a member of a protected class,

2. She was qualified for the position at issue,

3. She suffered an adverse employment action, and

4. That the circumstances surrounding the adverse action give rise
   to an inference of unlawful discrimination.

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Plaintiff's burden at the prima facie stage is not meant to be onerous. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 646 (3d Cir. 1988).

If Plaintiff establishes a prima facie case, Defendants must produce evidence showing that a legitimate nondiscriminatory reason can account for their actions. Fuentes, 32 F.3d at 763. However, even if Defendants produce such evidence, Plaintiff can still survive a summary judgment motion if she produces "sufficient evidence to raise a genuine issue of fact as to whether [Defendants'] proffered reasons were not [their] true reasons for the challenged employment action." Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996); see also Hicks, 509 U.S. at 511 ("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination" (emphasis in original)). Plaintiff can meet this burden by "present[ing] evidence contradicting the core facts put forward by [Defendants] as the legitimate reason for [their] decision," Tomasso v. Boeing

<u>Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006) (emphasis in the original) (quotation omitted), thereby "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for [their] action[s] that a reasonable fact finder <u>could</u> rationally find them unworthy of credence." <u>Fuentes</u>, 32 F.3d at 765 (emphasis in the original) (quotation omitted). Although the burden of production shifts throughout this process, the ultimate burden of persuading the trier of fact always remains with Plaintiff. <u>Burdine</u>, 450 U.S. at 253.

Regarding Plaintiff's prima facie case, there is no dispute that Plaintiff, an African American, is a member of a protected class. Nor do the parties dispute that Plaintiff was qualified to work as a charge nurse. Defendants do, however, dispute that Plaintiff suffered an adverse employment action, and that the circumstances surrounding her being denied charge nurse work give rise to an inference of discriminatory intent.

The Court will assume, without specifically concluding, that Plaintiff having been denied charge nurse work and, therefore, not receiving charge pay is an adverse employment action. <u>Cf.</u> <u>Hazen v. Modern Food Servs., Inc.</u>, 113 F. App'x 442, 444 (3d Cir. 2004) (affirming district court's ruling that the plaintiff did not suffer an adverse employment action when transferred to a different position with the same pay and job responsibilities). However, the Court finds that Plaintiff failed to establish that the circumstances surrounding her being denied charge nurse work give rise to an inference of discrimination.

Furthermore, even if Plaintiff could establish a prima facie case of discrimination, Defendants have advanced legitimate non-discriminatory reasons for Plaintiff's work assignments, and Plaintiff has failed to present any evidence that these reasons are mere pretexts for discrimination.

## 1. Summary of Plaintiff's Allegations Regarding Her Work Assignments

According to Plaintiff, her co-worker, Kaun, and their direct supervisor, Greene, conspired to deny Plaintiff work as the charge nurse for every shift during which Plaintiff worked with Kaun. Plaintiff alleges that Greene and Kaun effected their conspiracy by giving her a "run-around": Kaun claiming that Greene made decisions about who would be charge nurse, and Greene claiming that Plaintiff had to work out with Kaun how Plaintiff and Kaun would rotate as charge nurse. Plaintiff alleges that the motivation for this "run-around" was racial animosity.

For the reasons below, the Court finds that no reasonable jury could conclude that either Greene or Kaun discriminated against Plaintiff because of her race.

## 2. Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Infer that Greene Was Motivated by Racial Animus.

Nothing in the record supports a reasonable inference that Greene's conduct was motivated by racial animus. Plaintiff failed to muster any evidence that Greene permitted Kaun to deviate from a standard practice regarding her rotation as charge nurse with Plaintiff. In fact, the record establishes that there was no single, established rotation practice at Brooke Glen.[9]

---

[9] According to Plaintiff, the union contract under which she worked required Brooke Glen management to administer charge nurse rotation. (Resp. at 17 ("Under the clear terms of the union contract, a person wishing to be the charge nurse had to apply and the hospital was to make hiring decisions.").) However, nothing in the contract language quoted by Plaintiff created any such obligation:

> Charge Nurses will rotate until the hospital creates permanent charge nurse positions. Any qualified nurse willing to accept charge nurse responsibilities may apply for charge nurse positions. Hospital will at its sole discretion make hiring decisions based on skills and abilities. . . .

(Id.) The plain meaning of this language is that Brooke Glen would make hiring decisions regarding the "permanent charge nurse decisions." It says nothing about whether or how Brooke Glen must administer the rotation preceding those hiring decisions.

(Defs.' SUF ¶ 47; Greene Dep. 27:19-28:5, May 8, 2012 ("Q: Okay. The charge nurse position was a rotation; correct? Were you aware of that? / A: That was decided among the nurses, I am aware of that. / Q: Do you know how long rotation lasted? . . . / A: No, it's different. All the units are different.").) Regarding the evening shift on the adolescent unit, the record establishes that prior to Plaintiff working with Kaun, it was common practice for an experienced nurse, in this case Kaun, to assume charge nurse duties, while an inexperienced nurse, in this case Plaintiff, would assume medication nurse duties.[10] (Kaun Dep. 19:15-20:19, 29:4-22 ("When I came to [Brooke Glen], De'Andre [Mason] was [charge nurse]. I was med nurse. When [Plaintiff] came she was a new nurse."); id. at 131:24-132:8 ("Q: When working with [Mason] on the same unit, was there a division of labor between med nurse and charge nurse? / A: Yes. / Q: And was there one individual who generally assumed charge nurse duties? / A: Yes. / Q: Who was that? / A: [Mason].").) [11]

Plaintiff did testify that, in general, other white nurses were allowed to rotate as charge nurse. (Ellison Dep. 205:3-23, May 2, 2012.) However, even assuming that other white nurses at Brooke Glen rotated, this fact is not probative of Greene's alleged racial bias, because Plaintiff presented no evidence that Greene set rotation practices among these other nurses or intervened to resolve their rotation disputes.[12]

---

[10] Kaun testified that she rotated as charge nurse with two other African American nurses, but the record does not establish Kaun's level of experience when rotating. (Kaun Dep. 20:12-21:16, 134:2-135:18.) The record also fails to establish how often Kaun rotated with these nurses.

[11] Mason is an African American. (Id. at 20:9-19.)

[12] Plaintiff did allege that "[w]henever Plaintiff . . . submitted complaints to . . . Greene . . . Greene would turn the matter around, summon [Plaintiff] into her office to face unfounded complaints about [Plaintiff]." (Resp. at 28 (citing Ellison Dep. 221:2-222:21, May 2, 2012)). Plaintiff also testified about an alleged conversation she had with Greene, during which Greene allegedly said that she would not investigate Plaintiff's claims. (Ellison Dep. 222:6-223:13.)

Accordingly, nothing in the record even intimates that Greene subjected Plaintiff to disparate treatment, i.e. that she applied a different rotation policy as between Plaintiff and Kaun than she applied among other nurses. Under these circumstances, and in the absence of any other evidence of Greene's alleged racial animus, no reasonable jury could conclude that her conduct was influenced by Plaintiff's race.

### 3. Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Infer that Kaun Was Motivated by Racial Animus.

According to Plaintiff, a reasonable jury could conclude that Kaun's refusal to rotate with her as charge nurse was motivated by racial animus, because of Kaun's alleged reputation for racism and disproportionality harsh treatment of Plaintiff as compared to their non-African American co-workers. Plaintiff cites a variety of evidence to support her allegations, which the Court groups into and discusses in four categories. For the reasons below, none of the evidence, alone or in combination, supports a reasonable inference that Kaun was motivated by racial animus.

### i. Kaun's Emails to Her Supervisors Complaining about Plaintiff

Over the course of 2009, Kaun sent a series of emails to her supervisors complaining about Plaintiff.[13] However, it is undisputed, and the Court's review of the record confirms, that

---

However, Plaintiff cannot rely on her own unsupported testimony to oppose a motion for summary judgment. See Waris v. HCR Manor Care, Civil Action No. 07-3344, 2009 WL 330990, at *1 n.2 (E.D. Pa. Feb. 10, 2009) (Baylson, J.), aff'd, 365 F. App'x 402 (3d Cir. 2010) ("'courts do not weigh evidence or determine credibility questions at the summary judgment stage . . . .' [Nevertheless a] party opposing summary judgment must do more than just 'rest upon mere allegations, general denials, or . . . vague statements'" (quoting Hill v. City of Scranton, 411 F.3d 118, 131 (3d Cir.2006); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992); and Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir.2002) ("When opposing a motion for summary judgment, the party bearing the burden of persuasion in the litigation is obligated to identify those facts of record which would contradict the facts identified by the movant." (quotation omitted)))).

[13] Plaintiff was not aware of the emails at the time they were sent.

Kaun's emails neither refer explicitly to nor allude to race.[14]  Furthermore, while the emails

indicate an acute and ongoing conflict between Kaun and Plaintiff, Kaun's complaints are all

work-related, and she generally provided detailed descriptions of entirely work-performance-

related concerns.  Nothing about the content of these emails supports a reasonable inference that

Kaun's complaints were motivated by racial animus.

Additionally, the record establishes that Kaun's usual practice is to complain to

management about her co-workers, (see Kaun Dep. 41: 7-20 (Q:  As we sit here today, do you

still bring concerns to . . . Greene about issues with your coworkers? / A:  Yes. . . . I do it more

verbal now at this time because [Greene's] office is now on the unit, and we are on a smaller

unit.  I didn't have much face-to-face contact with her before. / Q:  And is this the reason why

you would do things by way of emails? / A:  Yes . . . .")), and Plaintiff admits that "evidence

exists to support a conclusion that Defendant Kaun periodically complained about white nurses."

(Resp. 24 (citing Greene Dep. 46:14-47:9)).  Given this context, it would be unreasonable to

conclude that Kaun's 2009 emails evince racial animus.

### ii.  Plaintiff's and Kaun's Antagonistic Work Relationship

Plaintiff and Kaun had an acrimonious relationship, and certain of Plaintiff's co-workers

believed that Kaun treated Plaintiff poorly.  However, the record does not support a reasonable

inference that Kaun singled out Plaintiff for any reason.  For example,

> 1.  Plaintiff's co-worker who believed that Plaintiff "took a lot"
>     from Kaun also believed that she took a lot from Kaun
>     (Kownacki Dep., Ex. 3 at BG00361-62);

---

[14] Plaintiff tries to make hay out of the fact that Kaun criticized two other African
American employees in her emails.  (Resp. at 34 (citing Greene Dep., Ex. 5 (Plaintiff references
a deposition exhibit not provided to the Court; contents of the exhibit are based on the deposition
testimony about the exhibit. (Id. at 51:5-52:20)).)  However, Kaun never mentions the race of the
people she is criticizing, and she provides detailed work-performance-related reasons for her
complaints.

2. Another co-worker stated that although Kaun yelled at Plaintiff, Kaun "yell[ed] because of frustration, not singling anyone out. She [was] that way with everyone not just [Plaintiff]. . . . It [was] pretty generalized. She want[ed] the job done her way" (Hofmann Dep., May 9, 2012, Ex. 10 at BGBH00267); and

3. A third co-worker stated that "When [Kaun] gets excited she gets disrespectful. It [was] not just at [Plaintiff]" (Kownacki Dep., Ex. 3 at BG00359-60).

While the record may establish that Kaun was generally difficult to work with, that does not support a reasonable inference that Kaun singled out Plaintiff for harsh treatment because of her race.[15]

### iii.  Kaun's Alleged Reputation for Racism and Treating Her African American Co-workers Unfairly

Plaintiff also attempts to establish that Kaun had a reputation for and history of treating African American co-workers unfairly. However, as detailed below, Plaintiff offers as "evidence" only her uncorroborated, subjective beliefs, which is patently insufficient to oppose a motion for summary judgment. Mlynczak v. Bodman, 442 F.3d 1050, 1058 (7th Cir. 2006) ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." (quotation omitted)); Koteles v. ATM Corp. of America, Civil Action No. 05-1061, 2008 WL 4412098, at *8 (E.D. Pa. Sept. 23, 2008) (Conti, J.) (a plaintiff's subjective belief regarding a defendant's motivations, without more, is wholly insufficient to establish a prima facie case of discrimination (citing Chappell v. GTE

---

[15] Plaintiff refers specifically to an incident during which Kaun allegedly tried to take a chart from Plaintiff and yelled at her. (Ellison Dep. 106:7-107:5). Even assuming this happened, Kaun did not make any racial comments during this incident, making this nothing more than additional disrespectful behavior on Kaun's part.

Prods. Corp., 803 F.2d 261 (6th Cir.1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination.")).[16]

Kaun allegedly told Plaintiff that she had been instrumental in getting other nurses fired, and Plaintiff later learned that these nurses were African American. Plaintiff would have the Court treat this as evidence that Kaun is racially biased. However, Plaintiff admitted that Kaun never mentioned the race of these nurses, (Ellison Dep. 214:7-216:4) and she failed to offer any evidence regarding the circumstances of their terminations to support her belief that Kaun was motivated by racial animus.

Plaintiff cited a written statement from an African American co-worked that the co-worker been warned to "watch out for this person and that, which these two people are [Kaun] and Mrs. Fran . . . they have some type of alliance, and whatever type of friendship they have its making the quality and care of the unit unprofessional, and it makes people not want to work on . . . [the] unit." (Hofmann Dep., Ex. 10 at BGBH00266.) Plaintiff would have the Court interpret this as referencing racial bias. However, the Court's review of the statement revealed no basis for that conclusion.

Plaintiff also cites another co-worker's written statement about an incident during which Kaun yelled at Plaintiff to stop talking about the election of President Barack Obama. (Kownacki Dep. Ex. 3 at BG00359-60). It is patently unreasonable to conclude that a strong reaction, by itself, to a political discussion in the workplace is a reaction to the race of the people and politicians involved.

---

[16] Plaintiff also alleged that Kaun denied charge nurse rotation to another African American co-worker on the evening shift on the adolescent unit. (Resp. at 18-19 (citing Kaun Dep. 20:9-19).) However, the record clearly establishes that the former co-worker in question was, in fact, charge nurse when working with Kaun, and that it was Kaun who was not generally allowed to be charge nurse. (Kaun Dep. 29:10-15; 131:16-133:22.)

Plaintiff testified that other nurses told her that Kaun did not get along with African Americans. Not only is this inadmissible hearsay, but Plaintiff admitted that none of the nurses explicitly mentioned race – Plaintiff interpreted their remarks as alluding to racial bias. (Ellison Dep. 211:8-24.) Even if Plaintiff were permitted to testify about these alleged statements, her subjective and unsubstantiated interpretation of them cannot provide a reasonable basis for inferring that Kaun was motivated by racial animus.

### iv. Other Facts from Which Plaintiff Claims Kaun's Racial Animosity May Be Inferred.

Plaintiff asserts that Kaun's racial animosity can be inferred from the fact that she worked with only approximately four African American nurses from 2008 through 2010.[17] Plaintiff did not provide any direct evidence that Kaun avoided working with African Americans and failed to explain how these raw tallies are statistically meaningful (e.g., Kaun worked with a disproportionality low number of African American nurses as compared to other nurses at Brooke Glen). Unexamined, raw tallies are not probative of discrimination. See Coe v. U.S. Steel Corp., Civil Action No. 11-5500, 2012 WL 5881850, at *11 (E.D. Pa. Nov. 12, 2012)

---

[17] Plaintiff's allegations are misrepresentations of the record. According to Plaintiff:

> 1. Kownacki testified that "between 2008 and 2010, only two or three other black nurses floated into the unit" where Plaintiff and Kaun worked (Resp. at 6 (citing Kownacki Dep. 61:5-22)); and
>
> 2. Kaun admitted that between 2008 and 2010, she worked with only one other African American nurse (Id. at 18-19 (citing Kaun Dep. 20:9-19).)

However, Kownacki did not testify to a specific number of nurses that "floated" through Kaun's unit. And Kaun never testified that she worked with only one other African American nurse. In the testimony cited by Plaintiff, Kaun does name a single African American nurse with whom she worked. However, Plaintiff did not cite, and omitted from her submissions, the immediately following testimony, in which Kaun identified four other African American co-workers. (Kaun Dep. 21:9-18.) Two of these nurses were also identified by Kownacki as African Americans that worked in Kaun's unit. (Kownacki Dep. 61:5-22.)

(Baylson, J.) (addressing tallies in the context of establishing that defendant's proffered legitimate non-discriminatory reasons are a mere pretext for discrimination).

Kaun also allegedly called Plaintiff a racial epithet. (Ellison Dep. 321:12-323:16.) Plaintiff apparently made a written account of this incident at some time prior to this law suit. Plaintiff admitted to never reporting the alleged slur to Brooke Glen, and that this is the only time that she heard Kaun use a racial epithet. (Id. at 322:19-23.)

While such language, if it was used, is inexcusable, "[t]he Third Circuit has repeatedly held that '[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given any weight, particularly if they were made temporally remote from the date of decision.'" Tolan v. Temple Health Sys. Transp. Team, Inc., Civil Action No. 09–CV–5492, 2013 WL 706049, at *14 (E.D. Pa. Feb. 26, 2013) (Ditter, J.). Plaintiff neither alleged that the epithet was used in relation to her request to rotate as charge nurse, nor provided any evidence that it was used in close proximity to any such request.[18] Therefore, even assuming Kaun called Plaintiff a racial epithet, the epithet alone cannot sustain a reasonable inference that Kaun refused to rotate as charge nurse with Plaintiff because of her race. Id. ("In considering whether stray remarks are probative of discrimination, the following factors must be considered: '(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement.'" (quoting Parker v. Verizon Penn., Inc., 309 F. App'x 551, 558-59 (3d Cir. 2009))).

---

[18] Kaun allegedly used the epithet in early October 2008. (Defs.' SUF ¶ 78.) The record reflects only one instance in which Plaintiff spoke to Kaun regarding charge nurse rotation, which was close to the time that Plaintiff finished her probationary period in July 2008, months before Kaun allegedly used the epithet. (Ellison Dep. 207:14-208:3; Kaun Dep. 29:13-30:2; Defs.' SUF ¶ 20.)

**v.      Summary of the Court's Findings**

Plaintiff did not provide sufficient evidence to support a reasonable inference that Kaun refused to rotate with her as charge nurse because of racial animus.  Absent from Plaintiff's submissions is any evidence that Kaun allowed other nurses with similar experience to Plaintiff to rotate with her while working on the adolescent unit, regardless of race.  Furthermore, the record establishes that Kaun's refusal to rotate with Plaintiff was consistent with rotation practice on the adolescent unit that predated Plaintiff and Kaun working together.

 The record also establishes that Kaun's harsh treatment of Plaintiff was consistent with Kaun's general work demeanor and treatment of other co-workers.  Plaintiff's uncorroborated, subjective beliefs about Kaun's motivations are patently insufficient to oppose a motion for summary judgment.

In this context, the single racial epithet that Kaun allegedly used outside of the context of her refusal to rotate with Plaintiff cannot support a reasonable inference that her refusal was racially motivated.  Cf. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 368 (3d Cir. 2008) ("'although . . . stray remarks, standing alone, may not give rise to an inference of discrimination, such remarks are not irrelevant'"; such remarks may "provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive" (alteration in original) (quoting Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 922 (8th Cir. 2000))).

The Court concludes that Plaintiff's evidence is insufficient to make out a prima facie case of discrimination.  However, for purposes of a full analysis of Defendants' Rule 56 Motion, the Court will assume that Plaintiff did establish her prima facie case and will complete the McDonnell Douglas-Burdine-Hicks analysis.  Defendants clearly established legitimate non-discriminatory reasons for Plaintiff's work assignments, and Plaintiff failed to present facts that

would allow a reasonable factfinder to conclude that those reasons are mere pretexts for discrimination.

### 4. Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Find that Defendants' Legitimate Non-discriminatory Reasons for Her Work Assignments Are Pretextual.[19]

According to Defendants, Brooke Glen management left charge nurse rotation decisions up to the nurses, and Kaun refused to rotate with Plaintiff because she disapproved of Plaintiff's job performance and was more experienced than Plaintiff. (Mot. at 20-21.) These are legitimate, non-discriminatory reasons for Plaintiff's work assignments, and it is irrelevant whether Brooke Glen was prudent in allowing nurses to set charge nurse rotation practices among themselves, or whether Kaun was correct in her assessment of Plaintiff's job performance and belief that greater experience better qualified her to be charge nurse. Fuentes, 32 F.3d at 765 ("the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent")

The record establishes that:

1.  Management left charge nurse rotation up to the nurses,

2.  Kaun had expressed concern with Plaintiff's job performance on numerous occasions, and

3.  At least on the adolescent unit, having an experienced nurse work as charge nurse and an inexperienced nurse work as medication nurse was common practice.

---

[19] Plaintiff made passing reference to a mixed motive basis for her discrimination in work assignment claim. (Resp. at 22.) However, as the foregoing discussion makes clear, Plaintiff presented no evidence that race "was a motivating factor for" Greene's or Kaun's refusal to allow Plaintiff to rotate as charge nurse. Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (quotations omitted).

Under these circumstances, Plaintiff has not shown facts from which a reasonable jury could find pretext, because she has not "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons . . . that a reasonable fact finder <u>could</u> rationally find them unworthy of credence." <u>Id.</u> (emphasis in the original) (quotation omitted).

> **B.     Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Find Discrimination Based on a Hostile Work Environment.**

In order to prove a claim under Title VII for racial discrimination due to a hostile work environment, the plaintiff must establish that:

1.   She suffered intentional discrimination because of her race;

2.   The discrimination was severe or pervasive;

3.   The discrimination detrimentally affected her;

4.   The discrimination would detrimentally affect a reasonable person "of the same race in her position"; and

5.   The basis for employer liability is present.

<u>Peace-Wickham v. Walls</u>, 409 F. App'x 512, 518 (3d Cir 2010) (citing <u>Jensen v. Potter</u>, 435 F.3d 444, 448 (3d Cir. 2006), <u>overruled in part on other grounds</u>, <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006)).

Plaintiff claims that Kaun's harsh treatment of her amounted to a hostile work environment motivated by racial animus. Based on the analysis above, Plaintiff and Kaun were acutely incompatible co-workers, and Plaintiff endured an extremely difficult work environment because of Kaun's conduct. At the same time, the above analysis also reveals insufficient evidence to support a reasonable inference that Kaun's behavior towards Plaintiff was motivated by race. To the contrary, the record indicates that Kaun was generally difficult to work with and regularly had work-related issues and conflicts with her co-workers. While this is unfortunate,

an acrimonious work environment is not a basis for relief under Title VII.  Jensen, 435 F.3d at

449 (3d Cir. 2006) ("Many may suffer severe or pervasive harassment at work, but if the reason

for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no

relief." (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); Shaner v.

Synthes, 204 F.3d 494, 500-01 (3d Cir. 2000); Aman v. Cort Furniture, 85 F.3d 1074, 1081-83

(3d Cir.1996)).

Additionally, even assuming that Kaun called Plaintiff a racial epithet, a single such

incident is insufficient to establish that Plaintiff faced severe or pervasive discrimination, as

required for relief under Title VII.  Drinkwater v. Union Carbide Corp., 904 F.2d 853, 863 (3d

Cir. 1990) ("Hostile environment harassment claims must demonstrate a continuous period of

harassment, and two comments do not create an atmosphere."); McCarty v. Marple Twp.

Ambulance Corps, 869 F.Supp.2d 638, 652-53 (E.D. Pa. 2012) (Brody, J.) ("one isolated racist

comment" was insufficient to establish that discrimination was severe or pervasive).

### C.   Plaintiff Presented Insufficient Evidence for a Reasonably Jury to Find that Defendants Retaliated Against Her for Complaining about Discrimination.

Plaintiff made a formal complaint to Brooke Glen in January 2010 and filed a complaint

with the EEOC on February 16, 2010 regarding racial discrimination.  Plaintiff claims that

Defendants retaliated against her for these complaints by:

> 1.   Delaying until May the resolution of Plaintiff's complaint that she had been improperly denied the opportunity to rotate as charge nurse while working with Kaun[20]; and

---

[20] Plaintiff also contended that Defendants continued to improperly deny her charge nurse rotation after her complaints.  (Resp. at 39.)  However, it is undisputed that after the investigation of Plaintiff's January complaint and Kaun's transfer off of the adolescent unit, Plaintiff was charge nurse on "many, even most shifts."  (Pl.'s Am. SUF ¶ 119; Defs.' SUF ¶¶ 34, 119 (stating that Plaintiff was charge nurse on "every" shift).)

> 2. At the May meeting, either constructively discharging her or taking other adverse employment actions against her, including placing her on administrative leave.

As with her claim of discrimination under Title VII, Plaintiff bears the initial burden of establishing a prima facie case of unlawful retaliation. See McKenna v. City of Philadelphia, 649 F.3d 171, 178 n.7 (3d Cir.2011). In particular, Plaintiff must show that:

> 1. She was engaged in a protected activity;
>
> 2. She suffered an adverse employment action after or contemporaneous with his protected activity; and
>
> 3. There is a causal link between his protected activity and the adverse employment action.

Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir.2007). Plaintiffs "usually" establish a causal link "by showing either '(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link'" Pollock v. The City of Philadelphia, 403 F. App'x 664, 668 (3d Cir. 2010) (quoting DeFlaminis, 480 F.3d at 267). "A causal link may also be shown by demonstrating that the record as a whole supports such an inference." Id.

If Plaintiff establishes her prima facie case of retaliation,

> the familiar McDonnell Douglas approach applies in which the burden shifts to [Defendants] to advance a legitimate, non-retaliatory reason for [their] conduct and, if [they] do[] so [P]laintiff must be able to convince the factfinder both that [Defendants'] proffered explanation was false, and that retaliation was the real reason for the adverse employment action.

Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) (citation omitted).

The Court finds that Plaintiff failed to make out her prima facie case because she failed to show facts sufficient to establish a causal link between her complaints and Defendants' allegedly retaliatory conduct. Furthermore, even if Plaintiff did establish her prima facie case, Defendants

proffered non-retaliatory reasons for their conduct, and Plaintiff has offered no evidence that these reasons are false or pretextual.

### 1. Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Find that Defendants Delayed Resolution of Her January Complaint.

Nothing in the record supports a reasonable inference that Defendants ignored Plaintiff's January complaint or delayed resolving any of her issues as a result of it. In fact, the record establishes that Defendants investigated Plaintiff's complaint. Unfortunately, Brooke Glen misunderstood the nature of her charge pay complaint, which delayed its resolution, but nothing in the record indicates that the delay was purposeful.

### 2. Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Find that Defendants Delayed Resolution of Her February EEOC Complaint.

Similarly, nothing in the record supports a reasonable inference that Defendants responded to Plaintiff's February 2010 EEOC complaint by delaying resolution of Plaintiff's concerns. Defendants did not receive the EEOC complaint until March, at which time the Director of Human Resources, Kownacki, was on leave. Kownacki did not return to work until sometime in April, at which time she began investigating the complaint. Plaintiff was then on leave that she requested from April 11, 2010 through May 26, 2010. Defendants convened a meeting to address the complaint on the first day that both Kownacki and Plaintiff were back from leave. Nothing about this scenario can reasonably support a jury finding that Defendants manufactured delay in addressing Plaintiff's complaint.

### 3. Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Find that Defendants Retaliated Against Plaintiff at the May Meeting.

Defendants' conduct at the May meeting cannot be reasonably interpreted as retaliation for Plaintiff's complaints. Because the May meeting was months after her complaints, Plaintiff's evidence cannot establish an "unusually suggestive temporal proximity between [her] protected

activity and the allegedly retaliatory action." Pollock, 403 F. App'x at 668 (citation omitted) (affirming district court's finding that a six-week gap "does not indicate a causal link").

Furthermore, while the dispute over Plaintiff's possession of hospital records was apparently heated, involving threats of police involvement and possibly termination, Plaintiff had apparently violated important hospital policy and possibly medical record confidentiality law. It would be unreasonable to view Defendants' response as a reaction to Plaintiff's complaints when Defendants had just made such a distressing discovery.

Moreover, Defendants' ultimate course of action, minimal administrative leave with pay, was entirely proportional to Plaintiff's conduct at the meeting and not suggestive of a retaliatory motive.

### 4. Plaintiff Presented Insufficient Evidence for a Reasonable Jury to Find that Defendants' Legitimate Non-retaliatory Reasons for Their Conduct Are Pretextual.

The foregoing analysis establishes that Defendants thoroughly investigated Plaintiff's formal complaints in a timely manner, and that any delay in their resolution resulted from either miscommunication or both Kownacki and Plaintiff taking voluntary leaves of absence at inopportune times. Plaintiff pointed to no evidence that Defendants manufactured any part of the delay.

Regarding Defendants' conduct at the May meeting, Plaintiff has offered no evidence to rebut Defendants' position that they were reacting to Plaintiff's improper, and possibly illegal, possession of hospital records. Plaintiff argued that pretext is evident from what she characterized as Defendants initial overreaction. (Resp, 39-40.) However, cooler heads prevailed after the meeting, and Plaintiff ultimately faced only minimal administrative leave with pay. Under these circumstances, no reasonable factfinder could conclude "that retaliation was the real reason for" any of Defendants' conduct. Moore, 461 F.3d at 342.

## VI.    Conclusion

Defendants' Motion for Summary Judgment will be GRANTED.  An appropriate order follows.

O:\CIVIL 11\11-5106 Ellison v. BHC\11cv5106.Memo Re Mot. Sum. J.docx